1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

ARTAVAZD OGANNESYAN,      ) Case No. CV 15-0220-JPR
                      )
         Plaintiff,   )
                      ) **MEMORANDUM OPINION AND ORDER**
         v.          ) **AFFIRMING COMMISSIONER**
                      )
CAROLYN W. COLVIN, Acting   )
Commissioner of Social     )
Security,               )
                      )
         Defendant.   )
                      )

**I.   PROCEEDINGS**

    Plaintiff seeks review of the Commissioner's final decision terminating payment of Supplemental Security Income ("SSI") benefits.  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  The matter is before the Court on the parties' Joint Stipulation, filed November 13, 2015, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed.

27
28

1

## II.  BACKGROUND

Plaintiff was born in Armenia in 1966 and moved to California in September 1989.  (Administrative Record ("AR") 30, 147, 234.)  He completed the eighth grade in Armenia[1] and has never worked.  (AR 52, 56, 164.)  In a determination dated January 29, 1993, he was found to have been disabled since June 11, 1992, because of posttraumatic stress disorder and back pain.  (AR 23-24, 61, 63, 241.)  In a determination dated August 21, 1996, his disability was found to continue.  (AR 23-24.)

On February 4, 2011, Plaintiff filed a disability report and a continuing-review disability report, alleging that he was unable to work because of back pain, right-leg pain, an eye injury, and anxiety.  (AR 164, 187.)  On July 22, 2011, Plaintiff was notified that his disability was found to have ended as of July 2011 and that his benefits would be terminated.  (AR 65-67.) He requested reconsideration of the cessation determination and appeared with an interpreter at a hearing before a Disability Hearing Officer ("DHO") on January 11, 2012.  (AR 64, 68, 80.) In a written decision issued the following day, the DHO found Plaintiff not disabled.  (AR 80-89.)

Plaintiff requested a hearing before an Administrative Law Judge.  (AR 93.)  A hearing was held on November 27, 2012, at which Plaintiff appeared with a nonattorney representative and

---

[1] In 2011 and 2012, Plaintiff reported that he had completed the eighth grade (AR 56, 285), but in 1996, he reported that he had completed the 12th grade (AR 234).

testified through an Armenian-language interpreter.[2] (AR 46, 49–57.)  A vocational expert ("VE") also testified. (AR 57–59.)  In a written decision issued November 29, 2012, the ALJ found that Plaintiff's disability had ended on July 1, 2011. (AR 23-32.) On November 13, 2014, after considering a new opinion from one of Plaintiff's treating physicians (AR 5, 351), the Appeals Council denied Plaintiff's request for review. (AR 1-5.)  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from

---

[2] Although the Commissioner states that Plaintiff was represented by an attorney (see, e.g., J. Stip. at 7, 10), the ALJ stated that he was represented by a "non-attorney representative" (AR 23) and the representative's name does not appear on the California State Bar's website.

1  the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715,

2  720 (9th Cir. 1996).  "If the evidence can reasonably support

3  either affirming or reversing," the reviewing court "may not

4  substitute its judgment" for the Commissioner's. Id. at 720-21.

5  **IV.   THE EVALUATION OF DISABILITY**

6       People are "disabled" for purposes of receiving Social

7  Security benefits if they are unable to engage in any substantial

8  gainful activity owing to a physical or mental impairment that is

9  expected to result in death or has lasted, or is expected to

10 last, for a continuous period of at least 12 months.  42 U.S.C.

11 § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.

12 1992).  Once they are found to be disabled, a "presumption of

13 continuing disability arises in [their] favor," and the

14 Commissioner "then bears the burden of producing evidence

15 sufficient to rebut" it.  Bellamy v. Sec'y of Health & Human

16 Servs., 755 F.2d 1380, 1381 (9th Cir. 1985); see also McCalmon v.

17 Astrue, 319 F. App'x 658, 659 (9th Cir. 2009).

18      Recipients of benefits are generally no longer disabled when

19 substantial evidence demonstrates medical improvement in their

20 physical and mental impairments and an ability to engage in

21 substantial gainful activity.  42 U.S.C. § 423(f); Flaten v.

22 Sec'y of Health & Human Servs., 44 F.3d 1453, 1460 (9th Cir.

23 1995).

24      A.   The Seven-Step Evaluation Process

25      The ALJ follows a seven-step sequential evaluation process

26 to assess whether a recipient continues to be disabled and

27 eligible for SSI benefits.  20 C.F.R. § 416.994; see Khampunbuan

28 v. Astrue, 333 F. App'x 217, 218 (9th Cir. 2009); Ferguson v.

4

1 _Comm'r of Soc. Sec._, No. 2:13-CV-2344-WBS-CMK, 2015 WL 5173952,

2 at *1 n.2 (E.D. Cal. Sept. 2, 2015).  In the first step, the

3 Commissioner determines whether the recipient has an impairment

4 or combination of impairments that meets or equals an impairment

5 in the Listing of Impairments ("Listing") set forth at 20 C.F.R.

6 part 404, subpart P, appendix 1; if so, the disability continues.

7 § 416.994(b)(5)(i).

8      If the recipient's impairment or combination of impairments

9 does not meet or equal an impairment in the Listing, the second

10 step requires the Commissioner to determine whether medical

11 improvement has occurred.[3]  § 416.994(b)(5)(ii).  If so, the

12 analysis proceeds to step three; if not, it proceeds to step

13 four.  _Id._

14     If medical improvement has occurred, the third step requires

15 the Commissioner to determine whether the improvement is related

16 to the recipient's ability to work — that is, whether the

17 recipient's residual functional capacity ("RFC")[4] has increased

18 since the most recent favorable medical decision.

19 § 416.994(b)(5)(iii).  If medical improvement is not related to

20

21      [3] Medical improvement is "any decrease in the medical

22 severity of [a recipient's] impairment(s) which was present at
   the time of the most recent favorable medical decision that [the

23 recipient was] disabled or continued to be disabled."
   § 416.994(b)(1)(i).  "A determination that there has been a

24 decrease in medical severity must be based on changes
   (improvement) in the symptoms, signs and/or laboratory findings

25 associated with [the recipient's] impairment(s)."  _Id._ (citing

26 § 416.928).

27      [4] RFC is what a claimant can do despite existing exertional
   and nonexertional limitations.  § 416.945; _see_ _Cooper v._

28 _Sullivan_, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

the recipient's ability to work, the analysis proceeds to step four; if it is, it proceeds to step five.   Id.

If medical improvement has not occurred or if it is not related to the recipient's ability to work, the fourth step requires the Commissioner to determine whether an exception applies.   § 416.994(b)(5)(iv).   Under the first group of exceptions, the Commissioner can find a recipient no longer disabled even though he has not medically improved if he is able to engage in substantial gainful activity; if one of these exceptions applies, the analysis proceeds to step five.[5] § 416.994(b)(3), (b)(5)(iv).   Under the second group of exceptions, the Commissioner can in certain situations find a recipient no longer disabled without finding medical improvement or an ability to engage in substantial gainful activity; if one of these exceptions applies, the recipient is no longer disabled.[6]   § 416.994(b)(4), (b)(5)(iv).   If none of the exceptions apply, the recipient continues to be disabled. § 416.994(b)(5)(iv).

The fifth step requires the Commissioner to determine whether all the recipient's current impairments in combination

---

[5] The first group of exceptions includes situations in which the recipient has undergone vocational therapy that improved his ability to perform jobs, new diagnostic techniques show that his impairments are not as disabling as previously thought, or the prior disability decision was erroneous.   § 416.994(b)(3).

[6] The second group of exceptions includes situations in which a prior determination was fraudulently obtained, the recipient doesn't cooperate with the agency, the agency can't find the recipient, or the recipient fails to follow prescribed treatment that would restore his ability to work. § 416.994(b)(4).

are "severe," which means that they significantly limit his ability to do basic work activities; if not, the recipient is no longer disabled. § 416.994(b)(5)(v).

If the recipient's current impairments in combination are severe, the sixth step requires the Commissioner to determine whether the recipient has sufficient RFC, "based on all [his] current impairments," to perform his past relevant work; if so, he is no longer disabled. § 416.994(b)(5)(vi).

If the recipient is unable to do his past work or if he has none, the seventh and final step requires the Commissioner to determine, using the RFC assessed in step six, whether the recipient can perform any other substantial gainful work; if so, he is no longer disabled. § 416.994(b)(5)(vii). If not, the recipient continues to be disabled. Id.

B.   The ALJ's Decision and Application of the Seven-Step Process

The ALJ found that as of August 21, 1996, the date of Plaintiff's most recent favorable medical decision, he had the medically determinable impairments of posttraumatic stress disorder and "back pain status post surgery," which had resulted in an RFC to perform light work with "moderate to severe psychosocial stressors."[7] (AR 24-25.) She found that as of July 1, 2011, Plaintiff had the medically determinable impairments of "mild degenerative disc disease of the lumbar spine/lumbar

---

[7] The most recent favorable medical decision is also known as the comparison-point decision. See Program Operations Manual System (POMS) DI 28010.105, U.S. Soc. Sec. Admin. (June 22, 2015), http://policy.ssa.gov/poms.nsf/lnx/0428010105 (last updated Jan. 13, 2016); see also § 416.994(b)(1)(vii).

spondylosis and obesity." (AR 25.) She also noted Plaintiff's hypertension and alleged mental impairments but found them not severe. (Id.)

At step one of the seven-step process, the ALJ found that since July 1, 2011, Plaintiff's impairments had not met or equaled an impairment in Listing. (AR 25.) At step two, she found that medical improvement had occurred as of July 1, 2011. (AR 25-30.) At step three, she found that Plaintiff's medical improvement was related to his ability to work. (AR 30.) She therefore did not address step four. See § 416.994(b)(5)(iv). At step five, she concluded that since July 1, 2011, Plaintiff's impairments had "continued to be severe." (AR 30; see also AR 25.) At step six, she found that beginning on July 1, 2011, Plaintiff had the RFC to perform medium work "except he can: frequently bend, stoop and twist." (AR 26.) She further found that he did not have any past relevant work. (AR 30.) At step seven, based on the VE's testimony, the ALJ concluded that beginning on July 1, 2011, Plaintiff could perform jobs existing in significant numbers in the national economy. (AR 30-31.) Accordingly, she determined that his disability ended on July 1, 2011. (AR 31-32.)

**V.   DISCUSSION**

Plaintiff raises eight separate issues, arguing that the ALJ erred in (1) admitting into evidence an investigation report by the Cooperative Disability Investigation ("CDI") unit,[8] (2)

---

[8] The Social Security Administration and the SSA's Office of the Inspector General established the CDI program to investigate
(continued...)

considering the "opinion of lay investigators" over Plaintiff's testimony and the opinions of his treating doctors, Michael Karapetian and Tigran I. Gervorkian, (3) relying on Plaintiff's household activities to find him not credible, (4) rejecting Dr. Karapetian's opinion based on the opinions of nontreating doctors, (5) mischaracterizing Drs. Karapetian's and Gervorkian's reports, (6) discounting Plaintiff's credibility, (7) mischaracterizing Plaintiff's testimony, and (8) relying on the VE's testimony to find that Plaintiff could perform other work. (J. Stip. at 4, 12, 20, 27, 30-32.)   In essence, therefore, Plaintiff challenges the ALJ's (1) admission of the CDI report, (2) weighing of the medical-opinion evidence, (3) credibility assessment, and (4) reliance on the VE's testimony.   Each of those four issues is discussed below.

A.   The ALJ Did Not Err in Admitting the CDI Report

Plaintiff argues that the ALJ "erroneously admitted" the CDI report and that he should have "had an opportunity to cross examine the investigators" who wrote the report, "especially concerning allegations suggesting malingering and fraud." (J. Stip. at 4-5.)

1.   Relevant background

In November 2011, Plaintiff's case was referred to the CDI unit after it began investigating Plaintiff's wife, who was apparently also receiving disability benefits (AR 148, 151) and

---

[8] (...continued)
suspected fraud in disability claims.   See Cooperative Disability Investigations (CDI), Office of the Inspector General, https://oig.ssa.gov/cooperative-disability-investigations-cdi (last accessed May 12, 2016).

was suspected of malingering. (AR 241 (noting that "other members of the same family receiving disability benefits is indicative for possible high risk for fraud and similar fault").) In January 2011, CDI investigators Michael Lavoie and Gregory Godina visited Plaintiff's residence three times and interviewed him once. (AR 242-43.) On April 5, 2011, Special Agent Glenn Roberts, a CDI-unit team leader, submitted a report with the following investigation summary:

> On January 5, 2011, [investigators] visited [Plaintiff's] residence . . . . To reach the apartment, one is required walking [sic] up approximately 25 steps of stairs because it does not have an elevator. [Investigator] Godina saw [Plaintiff] downstairs, sitting on a chair talking to an unknown male. . . .

> On January 8, 2011, [investigators] visited [Plaintiff's] residence . . . . [They] identified themselves and appraised [sic] [Plaintiff] as to the purpose of the visit. He understood the purpose of the interview [and] agreed to answer my questions. . . .

> [Plaintiff] stated the following about himself: He performs all his own hygiene and grooming. He is able to prepare meals and conduct household chores including cleaning without assistance. He is able to perform grocery shopping on a weekly basis. He is able to count money and make change. He uses a county debit card to buy food. He does not own a car and does not drive. He uses public transportation to get to the county welfare office. He walks approximately six city blocks with his

wife, two times a week to attend church.  He stated he ran out of all his medications and did not have any empty containers to show the investigators.

During the course of the interview, [Investigator] Godina observed the following regarding [Plaintiff]: He was well groomed with acceptable hygiene.  He was alert, oriented and focused.  He was able to understand and answer questions.  He was able to recall information. Without difficulty, he excused himself two times to attend to other matters and returned to resume the conversation where he stopped.  He did not exhibit any unusual behaviors.  He was able to remain seated with no signs of pain or discomfort.  He was able to stand and walk without difficulty.  His gait was normal.  He did not use any assistive devices to stand or walk.  He did not exhibit difficulty lifting and handling items.  He did not present himself in a depressed or worried manner. He did not become agitated at any time during the interview.   [Investigator] Godina further observed [Plaintiff] twice, ascend and descend two flights of stairs without the aid of handrails.  He climbed the stairway at a moderate to fast pace without exhibiting any signs of pain, shortness of breath, or loss of balance.

Subsequently on January 11, 2011, [Investigator] Godina observed the following: [Plaintiff] walked to the apartment building, alone.  He was walking unassisted and at a moderate pace.  He then jogged crossing the street

1   and entered the apartment building.  Upon reaching the

2   apartment building, he walked up the stairs to the second

3   floor towards . . . Godina at a rapid pace.  When he

4   reached . . . Godina's position, he was breathing

5   normally and showed no signs of physical distress.

6 (AR 242-43.)  The CDI report was made part of the administrative

7 record (<u>see</u> AR 240-43) and the ALJ relied on it in finding

8 Plaintiff no longer disabled (<u>see</u> AR 28-29).

9   2. <u>Analysis</u>

10  The ALJ permissibly admitted the CDI investigation report

11 into evidence and relied on it in making her nondisability

12 determination.  Indeed, in a recent unpublished opinion, the

13 Ninth Circuit found that an ALJ may rely on evidence related to

14 CDI unit investigations because "[t]he Social Security Act

15 expressly authorizes the Commissioner to 'conduct such

16 investigations and other proceedings as the Commissioner may deem

17 necessary or proper.'"  <u>Elmore v. Colvin</u>, 617 F. App'x 755, 757

18 (9th Cir. 2015) (quoting 42 U.S.C. § 405(b)(1)).  As the Ninth

19 Circuit noted, "there is nothing nefarious about ensuring that

20 only deserving claimants receive benefits."  <u>Id.</u>

21  And although Plaintiff argues that the ALJ's consideration

22 of the investigators' "unsworn" statements was erroneous, an ALJ

23 in fact has an obligation to consider such third-party statements

24 regarding a plaintiff's ability to work.  <u>See</u> <u>Molina v. Astrue</u>,

25 674 F.3d 1104, 1114 (9th Cir. 2012) ("Lay testimony as to a

26 claimant's symptoms or how an impairment affects the claimant's

27 ability to work is competent evidence that the ALJ must take into

28 account."); <u>Bruce v. Astrue</u>, 557 F.3d 1113, 1115 (9th Cir. 2009)

("In determining whether a claimant is disabled, an ALJ must
consider lay witness testimony concerning a claimant's ability to
work." (citing Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050,
1053 (9th Cir. 2006))); see also § 416.913(d) (statements from
"[o]ther non-medical sources," including spouses, parents, other
relatives, friends, neighbors, and clergy, can be used to show
severity of impairments and effect on ability to work);
§ 416.929(c)(3) (in evaluating symptoms, ALJ will consider
"observations by our employees and other persons"); SSR 96-7p,
1996 WL 374186, at *8 (July 2, 1996) ("In evaluating the
credibility of the individual's statements, the adjudicator must
also consider any observations recorded by SSA personnel who
previously interviewed the individual, whether in person or by
telephone."). Moreover, as Plaintiff acknowledges (J. Stip. at
6), an ALJ may receive evidence at an administrative hearing even
if it would be inadmissible under the rules of evidence
applicable to court proceedings. See Richardson, 402 U.S. at 400
("strict rules of evidence, applicable in the courtroom, are not
to operate at social security hearings so as to bar the admission
of evidence otherwise pertinent"); 42 U.S.C. § 405(b)(1)
("Evidence may be received at any hearing before the Commissioner
of Social Security even though inadmissible under rules of
evidence applicable to court procedure."); 20 C.F.R.
§ 416.1450(c) ("The administrative law judge may receive evidence
at the hearing even though the evidence would not be admissible
in court under the rules of evidence used by the court.").

Plaintiff nevertheless contends that the CDI report should
not have been admitted because he "did not have the opportunity

13

to cross examine the CDI investigators because the investigators did not appear at the hearing," and he was "not specifically informed that he had the right to subpoena" them. (J. Stip. at 5-6.) But the record shows that the agency provided Plaintiff with the full administrative record, which presumably included the CDI report (AR 94 (Apr. 2, 2012 letter stating that "[a] CD is enclosed that contains all of the evidence in your electronic folder to date"), 89 (hearing officer's Jan. 12, 2012 decision noting that evidence considered included "CDI")), and advised him on at least three separate occasions of his right to ask the ALJ to subpoena witnesses to testify at the hearing. (See AR 38 (Mar. 1, 2012 letter), 110 (Apr. 19, 2012 letter), 128-29 (Sept. 12, 2012 letter), 134-35 (same)); see also § 416.1450(d) (ALJ may "on his or her own initiative or at the request of a party, issue subpoenas for the appearance and testimony of witnesses"). Plaintiff cannot now complain that the investigators did not appear at the hearing when he never asked the ALJ to subpoena them. See Hubbard v. Barnhart, 225 F. App'x 721, 723 (9th Cir. 2007) (finding that detective's absence from hearing did not violate due process because plaintiff "failed to avail herself" of opportunity to request subpoena).[9] And when the ALJ asked at

_____

[9] Plaintiff attempts to distinguish Hubbard by stating, with no further explanation, that the video at issue in that case was "properly authenticated." (J. Stip. at 10-11.) But the video was simply an exhibit to a detective's investigative report and nothing shows that the report was signed under penalty of perjury or that the video was otherwise verified. See Hubbard, 225 F. App'x at 723; see also (J. Stip. at 11 (arguing that CDI report in this case should have been signed under penalty of perjury or "properly authenticated" with "certification" "verifying that it
(continued...)

1   the hearing whether Plaintiff had any objection to the documents
2   in the record, which included the CDI report, Plaintiff's
3   representative responded, "No, Your Honor." (AR 47.) Plaintiff,
4   moreover, was given a chance to respond to the report's findings
5   when the ALJ questioned him about them. (See AR 50-52.)

6       As such, nothing shows that the ALJ erred in considering the
7   CDI report. See Darmaryan v. Colvin, No. 14-CV-03551 (VEB), 2016
8   WL 1698252, at *8 (C.D. Cal. Apr. 27, 2016) (noting that "courts
9   have recognized that an ALJ may consider the findings of a fraud
10  investigation performed by the CDI when assessing a claimant's
11  credibility" and collecting cases); Manor v. Astrue, No.
12  C10-5944-JLR, 2011 WL 3563687, at *5-6 (W.D. Wash. July 28, 2011)
13  (finding ALJ's consideration of CDI report was not fundamentally
14  unfair when plaintiff had opportunity to challenge it by
15  objecting to its admission and requesting detectives' presence at
16  hearing), accepted by 2011 WL 3567421 (W.D. Wash. Aug. 12, 2011).
17  Remand is not warranted on this ground.

18      B.   The ALJ Did Not Err in Assessing the Medical Opinions
19      Plaintiff argues that the ALJ erroneously discounted the
20  opinions of her treating physicians, internist Dr. Karapetian and
21  psychiatrist Dr. Gevorkian. (J. Stip. at 12-13, 18-20, 27-28,
22  30-32.) Dr. Karapetian's opinion postdated the ALJ's decision by
23  seven months, but the Appeals Council considered it in denying

24
25       [9] (...continued)
    was a true and correct copy of a document in the Commissioner's
26  files").) In any event, the Ninth Circuit in Hubbard found that
    regardless of whether the video had a "proper foundation," it was
27  properly admitted under 20 C.F.R. § 404.950(c), which states that
    an ALJ may receive evidence that would not be admissible in
28  court. Id.; see also § 416.1450(c).

15

1   review and ordered that it be made part of the administrative

2   record.  (See AR 1-5.)

3          1.   Applicable law

4        Three types of physicians may offer opinions in Social

5   Security cases: (1) those who directly treated the plaintiff, (2)

6   those who examined but did not treat the plaintiff, and (3) those

7   who did neither.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir.

8   1995).  A treating physician's opinion is generally entitled to

9   more weight than an examining physician's, and an examining

10  physician's opinion is generally entitled to more weight than a

11  nonexamining physician's.  Id.

12       This is true because treating physicians are employed to

13  cure and have a greater opportunity to know and observe the

14  claimant.  Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

15  If a treating physician's opinion is well supported by medically

16  acceptable clinical and laboratory diagnostic techniques and is

17  not inconsistent with the other substantial evidence in the

18  record, it should be given controlling weight.  § 416.927(c)(2).

19  If a treating physician's opinion is not given controlling

20  weight, its weight is determined by length of the treatment

21  relationship, frequency of examination, nature and extent of the

22  treatment relationship, amount of evidence supporting the

23  opinion, consistency with the record as a whole, the doctor's

24  area of specialization, and other factors.  § 416.927(c)(2)-(6).

25       When a treating physician's opinion is not contradicted by

26  other evidence in the record, it may be rejected only for "clear

27  and convincing" reasons.  See Carmickle v. Comm'r, Soc. Sec.

28  Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (citing Lester, 81

16

F.3d at 830-31).   When it is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it.   Id. (citing Lester, 81 F.3d at 830-31).   Furthermore, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."   Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).

Social Security Administration regulations "permit claimants to submit new and material evidence to the Appeals Council and require the Council to consider that evidence in determining whether to review the ALJ's decision, so long as the evidence relates to the period on or before the ALJ's decision."   Brewes v. Comm'r of Soc. Sec. Admin., 682 F.3d 1157, 1162 (9th Cir. 2012); see also § 416.1470(b).   "[W]hen the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence."   Brewes, 682 F.3d at 1163; accord Taylor v. Comm'r of Soc. Sec. Admin., 659 F.3d 1228, 1232 (9th Cir. 2011); see also Borrelli v. Comm'r of Soc. Sec., 570 F. App'x 651, 652 (9th Cir. 2014) (remand necessary when "reasonable possibility" exists that "the new evidence might change the outcome of the administrative hearing").

2. Relevant background

i. *Examining Physician Concepcion A. Enriquez*

In May 2011, Dr. Enriquez, who was "board eligible" in internal medicine, examined Plaintiff at the Social Security Administration's request. (AR 244-47.) Dr. Enriquez found that Plaintiff's lumbar spine had tenderness and decreased range of motion of 70 out of 90 degrees on trunk flexion. (AR 246.) He had no muscle spasms, and straight-leg-raising tests were negative. (Id.) Ranges of motion of the cervical spine and all other joints were normal. (Id.) Plaintiff had normal muscle tone, 5/5 strength, intact sensation, and a normal gait. (AR 246-47.) An x-ray taken that day showed only mild degenerative disease at L5-S1.[10] (AR 248.) Dr. Enriquez opined that Plaintiff could lift and carry 100 pounds occasionally and 50 pounds frequently, stand and walk for six hours and sit for six hours in an eight-hour day, and frequently bend, stoop, and twist. (AR 247.)

ii. *Examining Physician Sharmin Jahan*

In June 2011, Dr. Jahan, a "board eligible" psychiatrist, performed a complete psychiatric examination of Plaintiff at the Social Security Administration's request. (AR 283-88.) Dr. Jahan noted that Plaintiff had immigrated to the United States from Armenia 23 years earlier. (AR 284.) Plaintiff reported that two years before that, several of his family members had been killed in an earthquake in Armenia, and he had been trapped

---

[10] In 1996, x-rays of Plaintiff's lumbosacral spine were normal. (AR 231.)

1  in rubble for five days before being rescued.  (Id.)  Since then,

2  he reported, he had experienced depression, lack of

3  concentration, flashbacks, numbness, bad dreams, and symptoms of

4  disassociation.  (Id.)

5      Plaintiff received Paxil[11] through his primary-care

6  physician but denied ever having seen a psychiatrist or therapist

7  or being in a psychiatric hospital.  (AR 284-85.)  He reported

8  that he was able to eat, dress, and bathe independently and could

9  "do some household chores, errands, shopping and cooking with his

10 wife's help."  (AR 285.)  He managed his own money and took the

11 bus for transportation.  (Id.)

12     Upon examination, Dr. Jahan found that Plaintiff was clean,

13 appropriately dressed, and slightly disheveled.  (AR 286.)  His

14 mood was anxious and depressed, his affect was blunted, and he

15 had poor eye contact.  (Id.)  All of Dr. Jahan's other findings

16 were normal: he found that Plaintiff was calm and not restless;

17 directable, focused, and not distractable; and alert and

18 oriented.  (Id.)  Plaintiff denied hallucinations and other

19 perceptual disturbances and had logical thoughts, intact

20 attention and immediate recall, fairly intact past memories,

21 average general fund of knowledge, and fair insight and judgment.

22 (AR 286-87.)  He was able to express his own personal history and

23 was interested in the interview.  (AR 286.)

24     Dr. Jahan diagnosed moderate posttraumatic stress disorder

25

26     [11] Paxil is a selective serotonin reuptake inhibitor used to

27 treat depression and other conditions.  Paroxetine, MedlinePlus,
   https://www.nlm.nih.gov/medlineplus/druginfo/meds/a698032.html

28 (last updated Nov. 15, 2014).

1  and a global assessment of functioning ("GAF") score of 60.[12]

2  (AR 287.)  She believed that Plaintiff was able to understand,

3  remember, and perform simple tasks but was moderately limited in

4  his ability to understand and follow complex and detailed

5  instructions; interact with coworkers, colleagues, and

6  supervisors; and maintain concentration, attention, persistence,

7  and pace.  (Id.)  She believed Plaintiff's ability to cope with

8  workplace stress was "limited."  (Id.)  Dr. Jahan "expected that

9  with continuation of treatment [Plaintiff] would be able to cope

10  well and would be able to maintain his stability."  (Id.)  She

11  believed his prognosis was "fair" and that he was capable of

12  managing his own funds.  (AR 288.)

13                    iii.  *Consulting Physicians R.E. Brooks and R.*

14                          *Tashjian*

15     In July 2011, Dr. Brooks, who specialized in psychiatry,

16  reviewed Dr. Jahan's evaluation and the CDI report and completed

17  a psychiatric-review-technique form.[13]  (AR 289-300.)  Dr. Brooks

18

19     [12] A GAF score of 51 to 60 indicates moderate symptoms or
    difficulty in social, occupational, or school functioning.  See
20  Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV")
    34 (revised 4th ed. 2000).  The Commissioner has declined to
21  endorse GAF scores, Revised Medical Criteria for Evaluating
    Mental Disorders and Traumatic Brain Injury, Fed. Reg. 50764-65
22  (Aug. 21, 2000) (codified at 20 C.F.R. pt. 404) (GAF score "does
    not have a direct correlation to the severity requirements in our
23  mental disorders listings"), and the most recent edition of the
    DSM "dropped" the GAF scale, citing its lack of conceptual
24  clarity and questionable psychological measurements in practice.
    Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed.
25  2012).
26

27     [13] Drs. Brooks's and Tashjian's electronic signatures
    include a medical specialty code of 37, indicating psychiatry.
28                                         (continued...)

determined that Plaintiff's posttraumatic stress disorder was not severe and resulted in no restriction of activities of daily living and no difficulties in maintaining social functioning, concentration, persistence, or pace.  (AR 289, 292, 297.)  He opined that Dr. Jahan's "[o]ne-time" evaluation did "not give a total picture of [Plaintiff's] mental status" and that the CDI report was "given the controlling weight as it showed extensive report on [Plaintiff's] capability to function."  (AR 299.)

In September 2011, Dr. Tashjian, who also specialized in psychiatry, reviewed the record and agreed that Plaintiff's posttraumatic stress disorder was not severe.  (AR 301, 305, 311.)

#### iv.  *Treating Physician Gevorkian*

In a March 2012 note, Dr. Gevorkian, who specialized in psychiatry, stated that Plaintiff had been under his care since February 2012 and suffered from "major depression and PTSD for which [he] is taking psychotropic medications."  (AR 312.)

In May 2012, Dr. Gevorkian completed a Mental Disorder Questionnaire, noting that he had seen Plaintiff monthly since February 1, 2012.  (AR 344-49.)  He stated that Plaintiff reported having low energy, decreased concentration, decreased appetite, insomnia, and feelings of hopelessness and worthlessness.  (AR 344.)

Dr. Gevorkian noted that Plaintiff "always appears

---

[13] (...continued)
(AR 289); <u>see</u> Program Operations Manual System ("POMS") DI 24501.004, U.S. Soc. Admin. (May 5, 2015), http://
policy.ssa.gov/poms.nsf/lnx/0424501004.

depressed, sad with psychomotor retardation." (AR 348.) His speech was delayed and slow, concentration "severely impaired," short- and long-term memories impaired, affect restricted, thought process linear but slowed, and insight and judgment impaired. (AR 346, 348.) He had "paranoid type delusions," passive suicidal ideations, and borderline intellectual functioning. (AR 346, 348.) As a result of his symptoms, Plaintiff isolated himself, stayed home most of the time, and needed assistance with daily chores. (AR 345.) He had difficulty communicating with family members and did not interact with neighbors or friends. (Id.) Plaintiff understood simple oral and written directions but was unable to carry them out because he was depressed. (Id.) Dr. Gevorkian believed that Plaintiff could not adapt to workplace stressors such as making decisions and interacting with others. (Id.) Dr. Gevorkian diagnosed major depressive disorder with paranoia, posttraumatic stress disorder, anxiety disorder, and a GAF score of 45 to 50.[14] (AR 347.) He believed Plaintiff's prognosis was "guarded" and that he was not competent to manage his funds. (Id.)

v.   *Treating Physician Karapetian*

In March 2012, Dr. Karapetian wrote a note stating that Plaintiff had been under his care since 2003 and that his "current diagnoses" were hypertension, lumbar spondylosis, depression, anxiety, hyperlipidemia, and gastroesophageal reflux disease. (AR 313.)

_____

[14] A GAF score of 41 to 50 indicates "serious symptoms." DSM-IV 34.

In June 2013, seven months after the ALJ issued her opinion, Dr. Karapetian wrote a letter stating that Plaintiff had been under his care since 2003 and was disabled due to hypertension, lumbar spondylosis with neuropathy, lumbago, history of back trauma, depression, anxiety, hyperlipidemia, history of hernia, lower extremity venous insufficiency, history of nephrolithiasis,[15] peripheral vascular disease, aortic regurgitation, tricuspidal and mitrial valve mild stenosis, and gastroesophageal reflux disease.  (AR 351.)

### 3.  Analysis

The ALJ summarized the medical evidence and concluded that Plaintiff retained the RFC for medium work with frequent bending, stooping, and twisting.  (AR 26, 30.)  In doing so, she accorded "great weight" to Drs. Enriquez's, Brooks's, and Tashjian's opinions, finding that they comported with "the objective findings in the record" and Plaintiff's "statements regarding his capacity to perform daily activities."  (AR 30.)  The ALJ accorded "great weight" to Dr. Jahan's "clinical notes and finding" but "less weight" to her conclusion that Plaintiff had some moderate work restrictions.  (AR 27-28.)  The ALJ gave Dr. Gevorkian's opinion "no weight."  (AR 28.)  For the reasons discussed below, the ALJ did not err in assessing the medical evidence.

---

[15] Nephrolithiasis is the medical term for kidney stones. Kidney Stones, Mayo Clinic, http://www.mayoclinic.org/ diseases-conditions/kidney-stones/basics/definition/con-20024829 (last updated Feb. 26, 2015).

1

i.   *Dr. Karapetian*

2     After the ALJ rendered her unfavorable decision, Plaintiff

3   submitted to the Appeals Council Dr. Karapetian's June 2013

4   letter stating that Plaintiff was "disabled" because of 14

5   different medical conditions.  (AR 351.)  Because the Appeals

6   Council considered the June 2013 letter and made it part of the

7   administrative record (see AR 1-5), the Court considers it in

8   determining whether substantial evidence supports the ALJ's

9   decision.   See Brewes, 682 F.3d at 1163.  As discussed below,

10  remand is not necessary because Dr. Karapetian's brief,

11  unsupported statement does not undermine the ALJ's determination

12  that Plaintiff was not disabled.  (See AR 351); see Boyd v.

13  Colvin, 524 F. App'x 334, 336 (9th Cir. 2013) (remand not

14  warranted when new evidence did not "sufficiently undermine[]"

15  ALJ's ruling).

16     As an initial matter, Dr. Karapetian's opinion simply stated

17  that Plaintiff was "disabled" without listing any specific

18  functional limitations or explaining how Plaintiff's impairments

19  limited his ability to work.  A physician's conclusory statement

20  that a person is "disabled" is not binding on the ALJ or entitled

21  to any special significance.  See § 416.927(d)(1) ("A statement

22  by a medical source that you are 'disabled' or 'unable to work'

23  does not mean that we will determine that you are disabled.");

24  SSR 96-5p, 1996 WL 374183, at *5 (treating-source opinions that

25  person is disabled or unable to work "can never be entitled to

26  controlling weight or given special significance").

27     Moreover, as the ALJ found, Dr. Karapetian's notes largely

28  contained "nothing more than subjective complaints with no

24

clinical notations other than reiterations that [Plaintiff's] blood pressure was under control."[16]   (AR 28); see Thomas, 278 F.3d at 957 (ALJ "need not accept the opinion of . . . a treating physician" if it is "brief, conclusory, and inadequately supported by clinical findings"); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (when ALJ properly discounted claimant's credibility, he was "free to disregard" doctor's opinion that was premised on claimant's subjective complaints). Indeed, Dr. Karapetian's notes are very brief, mainly noting on check-off forms Plaintiff's complaints of depressed mood, back pain, heartburn, and, occasionally, cold symptoms or heart palpitations.[17]   In a few notes issued after the DRO's January 2012 decision, Dr. Karapetian also recorded Plaintiff's complaints of anxiety, and in May 2012, he recorded Plaintiff's

---

[16] The ALJ stated that the record contained only four of Dr. Karapetian's treatment notes from 2011 and four from 2012 (AR 28), but in fact, the record contains five notes from 2011 (see AR 271-81, 340) and four from 2012 (AR 336-39) as well as seven from 2010 (AR 258-70).

[17] (See AR 259 (Jan. 2010, feels better but complains of depressed mood), 258 (Feb. 2010, feels better but complains of depressed mood), 260 (Mar. 2010, complains of low-back pain and depressed mood), 264 (May 2010, complains of depressed mood and low-back pain "off and on"), 262 (July 2010, complains of depressed mood, low-back pain, and "brittle fingernail"), 268 (Oct. 2010, complains of depressed mood that was improving with treatment, back pain, heartburn, and nausea), 269 (Dec. 2010, feels "well" but complains of depressed mood, heartburn, back pain), 271 (Jan. 2011, complains of depressed mood, back pain, heartburn, bloating, cough, and heart palpitation), 274 (Mar. 2011, complains of depressed mood, back pain, bloating, and heartburn), 277 (Apr. 2011, complains of back pain, heart palpitations, depression, and heartburn), 280 (June 2011, complains of back pain, depression, and heartburn), 340 (Sept. 2011, complains of back pain, depression, and heartburn).)

complaints of muscle pain, muscle spasm, and decreased range of motion of the back.[18]  Dr. Karapetian recorded very few supporting clinical findings; he generally indicated in the "objective" section of his notes only that Plaintiff had varicose veins and spine tenderness.  (See AR 258-60, 262, 264, 267, 270, 278, 281; see also AR 272 (noting spine tenderness and cold symptoms); cf. AR 275 (Mar. 2011, noting spine tenderness and decreased range of motion).)

Dr. Karapetian's June 2013 letter also conflicts with his March 2012 letter and his own treatment notes.  See Valentine v. Comm'r, Soc. Sec. Admin., 574 F.3d 685, 692-93 (9th Cir. 2009) (contradiction between treating physician's opinion and his treatment notes constitutes specific and legitimate reason for rejecting treating physician's opinion).  Dr. Karapetian's June 2013 letter listed 14 medical conditions and stated that Plaintiff was disabled (AR 351), but his March 2012 letter listed only six medical conditions — hypertension, lumbar spondylosis, depression, anxiety, hyperlipidemia, and gastroesophageal reflux disease — and didn't set out any limitations or conclude that he was disabled (AR 313).  Dr. Karapetian's treatment notes also fail to reflect some of the additional conditions listed in the

---

[18] (See AR 336 (Jan. 2012, complains of back pain, anxiety, heart palpitation, heartburn, and depression), 338 (Feb. 2012, complains of back pain, anxiety, depression, and heartburn), 339 (Feb. 2012, complains of anxiety, depression, and heartburn), 337 (May 2012, complains of back pain, decreased range of motion of back, muscle spasm, muscle pain, anxiety, and depression).)

1    June 2013 letter.[19]  Indeed, given that the June 2013 letter

2    postdates the ALJ's November 2012 decision by seven months and

3    includes diagnoses that were not reflected anywhere in the

4    earlier notes, it likely does not show Plaintiff's condition

5    during the relevant time period.  As such, it is minimally

6    relevant.  See Quesada v. Colvin, 525 F. App'x 627, 630 (9th Cir.

7    2013) (finding that "district court properly concluded that the

8    additional evidence [plaintiff] submitted to the Appeals Council

9    would not have changed the outcome in the case because it

10   post-dated the ALJ's decision and therefore was not relevant").

11       Finally, Dr. Enriquez's opinion provides ample support for

12   the ALJ's finding that Plaintiff could perform a limited range of

14       [19] Dr. Karapetian's June 2013 letter stated that Plaintiff
15   suffered from, among other things, neuropathy, history of hernia,
     lower extremity venous insufficiency, history of nephrolithiasis,
16   peripheral vascular disease, aortic regurgitation, and
     tricuspidal and mitrial valve mild stenosis.  (AR 351.)  These
17   diagnoses don't appear in any of Dr. Karapetian's treatment
     notes.  (See AR 259 (Jan. 2010, hypertension, hyperlipidemia,
18   lumbar spondylosis, gastroesophageal-reflux disease, and
     depression), 258 (Feb. 2010, same), 260 (Mar. 2010, same but
19   adding "[f]ingemail [sic] deformity"), 264 (May 2010,
     hypertension, hyperlipidemia, lumbar spondylosis, and
20   depression), 262 (July 2010, depression, fingernail deformity,
     hypertension, hyperlipidemia, lumbar spondylosis,
21   gastroesophageal-reflux disease), 268 (Oct. 2010, no diagnosis
     listed), 270 (Dec. 2010, hypertension, "GERD," depression, lumbar
22   spondylosis, and other illegible conditions), 272 (Jan. 2011,
     palpitation, depression, common cold, "GERD," lumbar spondylosis,
23   and other illegible conditions), 275 (Mar. 2011, hypertension,
     depression, "GERD," lumbar spondylosis, and another illegible
24   condition), 278 (Apr. 2011, palpitation, hypertension,
     depression, "GERD," lumbar spondylosis, and another illegible
25   condition), 281 (June 2011, hypertension, depression, "GERD,"
     lumbar spondylosis, and another illegible condition), 340 (Sept.
26   2011, no diagnosis listed), 336 (Jan. 2012, same), 338 (Feb.
27   2012, same), 339 (Feb. 2012, same), 337 (May 2012, same).)

28

medium work.  Dr. Enriquez examined Plaintiff and found that he had tenderness in the lumbosacral spine area and decreased range of motion on trunk flexion.  (AR 246.)  All other findings were normal — for example, Plaintiff had a normal gait, intact sensation, 5/5 strength, and normal ranges of motion of all other joints.  (AR 246-47.)  And an x-ray taken that day showed only mild degenerative disease at L5-S1.  (AR 248.)  Consistent with those findings, Dr. Enriquez opined that Plaintiff could lift 100 pounds occasionally and 50 pounds frequently and stand and walk for six hours and sit for six hours in an eight-hour day.  (AR 247.)  The ALJ credited Dr. Enriquez's opinion but gave Plaintiff "some benefit of the doubt" and limited him to medium work.  (AR 30.)  Because Dr. Enriquez personally observed and examined Plaintiff and her findings were consistent with the objective evidence, her opinion constitutes substantial evidence supporting the ALJ's decision.  See Tonapetyan, 242 F.3d at 1149 (finding that examining physician's "opinion alone constitutes substantial evidence, because it rests on his own independent examination of [claimant]"); Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (opinion of nontreating source based on independent clinical findings may itself be substantial evidence).

Plaintiff challenges the ALJ's asserted failure to credit Dr. Karapetian's June 2013 opinion (see, e.g., J. Stip. at 12-13, 19 (arguing that ALJ should not have credited CDI report over Dr. Karapetian's June 2013 opinion that Plaintiff was totally disabled), 28 (stating that ALJ erroneously "did not give any weight to the findings of Dr. Karapetian who treated the Plaintiff for over 12 years"); see also id. at 30-31), but as

1   discussed above, that opinion was never before the ALJ.  Rather,

2   it postdated the ALJ's decision by seven months and was submitted

3   directly to the Appeals Council.  (AR 1-5.)  As such, the Court

4   has considered whether the ALJ's decision was supported by

5   substantial evidence notwithstanding that report.  Because

6   substantial evidence still supports the ALJ's assessment of the

7   medical evidence, remand is not warranted.  See Sullivan v.

8   Colvin, 588 F. App'x 725, 726-27 (9th Cir. 2014) (declining to

9   remand based on new evidence submitted to Appeals Council because

10  even though "the new evidence supported [plaintiff's] disability

11  allegations, substantial evidence still supported the ALJ's

12  nondisability determination").

13                    ii.  *Dr. Gevorkian*

14       Dr. Gevorkian's opinion conflicted with Dr. Jahan's clinical

15  findings and Drs. Brooks's and Tashjian's opinions that

16  Plaintiff's alleged psychiatric impairment was not severe.  As

17  such, the ALJ was required to provide only specific and

18  legitimate reasons for rejecting the opinion, which she did.

19       As the ALJ noted (AR 28), Dr. Gevorkian first saw Plaintiff

20  in February 2012 — less than a month after the DHO denied

21  Plaintiff's request for continued benefits — and he saw Plaintiff

22  only a couple more times before rendering his opinion, in May

23  2012.[20]  (AR 347.)  The ALJ was entitled to consider Dr.

24

25       [20] The ALJ stated that Dr. Gevorkian had been treating
26  Plaintiff for only two months before rendering his opinion (AR
    28), but it was actually just over three.  (AR 347 (stating that
27  first examination was on Feb. 1, 2012, last examination was on
    May 16, 2012, and frequency of visits was "monthly").)  Because
28                                              (continued...)

29

Gevorkian's brief, three-month treatment relationship with
Plaintiff when weighing his opinion.  See § 416.927(c)(2)(i)
(stating that ALJ will consider "[l]ength of the treatment
relationship and the frequency of examination").  The ALJ also
noted that Dr. Gevorkian's opinion was not supported by any
treatment notes (AR 28), which was another permissible reason for
discounting it.  See Thomas, 278 F.3d at 957 (ALJ "need not
accept the opinion of . . . a treating physician" if it is
"brief, conclusory, and inadequately supported by clinical
findings"); § 416.927(c)(3) ("The more a medical source presents
relevant evidence to support an opinion, particularly medical
signs and laboratory findings, the more weight we will give that
opinion.").

The ALJ also properly discounted Dr. Gevorkian's opinion
because he "essentially took [Plaintiff's] words as reasons to
support his claim [that Plaintiff] was disabled." (AR 28); see
Tonapetyan, 242 F.3d at 1149 (when ALJ properly discounted
claimant's credibility, he was "free to disregard" doctor's
opinion that was premised on claimant's subjective complaints).
Given that minimal objective medical evidence in the record
supported Dr. Gevorkian's assessed limitations, the ALJ
reasonably found that his opinion was based primarily on
Plaintiff's subjective complaints.  As discussed in Section C
below, moreover, the ALJ provided clear and convincing reasons

---

[20] (...continued)
this was still a very brief treatment history that encompassed
only a handful of visits, any error in the ALJ's statement was
harmless.  See Stout, 454 F.3d at 1055 (nonprejudicial or
irrelevant mistakes harmless).

1  for finding Plaintiff not credible.

2      Finally, the ALJ was entitled to rely on Dr. Jahan's

3  clinical findings and Drs. Brooks's and Tashjian's opinions

4  instead of Dr. Gevorkian's.  The ALJ found that the examining and

5  consulting doctors' opinions "agree[d] with the objective

6  findings in the record, as well as [Plaintiff's] statements

7  regarding his capacity to perform daily activities."  (AR 30.)

8  Indeed, Dr. Jahan's only abnormal examination findings were that

9  Plaintiff had an "anxious and depressed" mood, blunted affect,

10 and poor eye contact.  (AR 286-87.)  Dr. Jahan found that

11 Plaintiff was otherwise normal: he was calm, directable, focused,

12 cooperative, and oriented, and he had spontaneous and fluent

13 speech; intact attention, recall, and memories; logical and

14 sequential thoughts; an average general fund of knowledge; and

15 fair insight and judgment.  (Id.)  He did not have "paranoid

16 ideation" or delusions.  (AR 286.)  Drs. Brooks's and Tashjian's

17 findings that Plaintiff's alleged psychological condition was not

18 severe were consistent with Dr. Jahan's clinical findings and the

19 CDI report, which showed that Plaintiff was alert, oriented,

20 focused, and well-groomed and able to answer questions and recall

21 information, perform chores and prepare meals without assistance,

22 shop for groceries, use public transportation, use a county debit

23 card to buy food, and attend church twice a week.  (AR 242-43.)

24 As such, the ALJ was entitled to rely on Dr. Jahan's clinical

25 findings and Drs. Brooks's and Tashjian's opinions.  See

26 Tonapetyan, 242 F.3d at 1149 (although "contrary opinion of a

27 non-examining medical expert does not alone constitute a

28 specific, legitimate reason for rejecting a treating or examining

31

1  physician's opinion, it may constitute substantial evidence when

2  it is consistent with other independent evidence in the record").

3  Plaintiff argues that the ALJ should have credited Dr.

4  Gevorkian's opinion because it was supported by "clinical

5  observations." (J. Stip. at 31-32.) But as discussed above, Dr.

6  Gevorkian's findings — such as that Plaintiff had "delayed" and

7  slow speech, "severely impaired" concentration, paranoid

8  delusions, slow thought process, impaired short- and long-term

9  memories, impaired insight and judgment, borderline intellectual

10 functioning, and psychomotor retardation and needed help with

11 daily chores (AR 345-46, 348) — conflicted with Dr. Jahan's

12 clinical findings, the CDI investigators' observations, and

13 Plaintiff's own reports of his daily activities. As such, and in

14 light of the ALJ's other stated reasons, the ALJ did not err in

15 crediting the other doctors' medical opinions over Dr.

16 Gevorkian's.

17 Remand is not warranted on this ground.

18 C.   The ALJ Did Not Err in Discounting Plaintiff's

19      Credibility

20 Plaintiff contends that the ALJ erred in discounting his

21 credibility. (J. Stip. at 12-13, 20-21, 25-26, 32-36.)

22      1.   Applicable law

23 An ALJ's assessment of symptom severity and claimant

24 credibility is entitled to "great weight." See Weetman v.

25 Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended); Nyman v.

26 Heckler, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24,

27 1986). "[T]he ALJ is not 'required to believe every allegation

28 of disabling pain, or else disability benefits would be available

1   for the asking, a result plainly contrary to 42 U.S.C.

2   § 423(d)(5)(A).'" Molina, 674 F.3d at 1112 (quoting Fair v.

3   Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

4        In evaluating a claimant's subjective symptom testimony, the

5   ALJ engages in a two-step analysis. See Lingenfelter, 504 F.3d

6   at 1035-36. "First, the ALJ must determine whether the claimant

7   has presented objective medical evidence of an underlying

8   impairment '[that] could reasonably be expected to produce the

9   pain or other symptoms alleged.'" Id. at 1036 (quoting Bunnell

10  v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). If

11  such objective medical evidence exists, the ALJ may not reject a

12  claimant's testimony "simply because there is no showing that the

13  impairment can reasonably produce the degree of symptom alleged."

14  Smolen, 80 F.3d at 1282 (emphasis in original).

15       If the claimant meets the first test, the ALJ may discredit

16  the claimant's subjective symptom testimony only if he makes

17  specific findings that support the conclusion. See Berry v.

18  Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or

19  affirmative evidence of malingering, the ALJ must provide "clear

20  and convincing" reasons for rejecting the claimant's testimony.

21  Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as

22  amended); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090,

23  1102 (9th Cir. 2014). The ALJ may consider, among other factors,

24  (1) ordinary techniques of credibility evaluation, such as the

25  claimant's reputation for lying, prior inconsistent statements,

26  and other testimony by the claimant that appears less than

27  candid; (2) unexplained or inadequately explained failure to seek

28  treatment or to follow a prescribed course of treatment; (3) the

33

1   claimant's daily activities; (4) the claimant's work record; and

2   (5) testimony from physicians and third parties.  Rounds v.

3   Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (as

4   amended); Thomas, 278 F.3d at 958-59.  If the ALJ's credibility

5   finding is supported by substantial evidence in the record, the

6   reviewing court "may not engage in second-guessing."  Thomas, 278

7   F.3d at 959.

8                    2.   Relevant background

9        In a February 4, 2011 disability report, Plaintiff wrote

10  that he was unable to work because of back pain, right-leg pain,

11  an eye injury, and anxiety.  (AR 164.)  In a function report

12  completed that same day, he wrote, "I have back pain and I cannot

13  stay on my feet and I cannot work."  (AR 175.)  His daily

14  activities included taking medicine, "do[ing] household chores,"

15  napping for one or two hours, watching T.V. for one or two hours,

16  showering, and eating meals.  (AR 176.)  He later wrote that his

17  only household chore was to take out the trash every other day,

18  which took about 10 minutes.  (AR 177.)  He did not prepare his

19  own meals because he "d[id] not know how to cook."  (Id.)  He had

20  no problems with personal care, handling money, or paying bills.

21  (AR 176, 178.)  He went outside twice a day, traveled by walking

22  or using public transportation, and shopped in stores for

23  groceries two or three times a week for 30 minutes at a time.

24  (AR 178.)  Plaintiff did not drive because he did not have a car.

25  (Id.)  He did not spend time with others.  (AR 179.)  When asked

26  to list the places he went on a regular basis, such as "church,"

27  he wrote that he did not leave the house unless he needed to go

28  to the store.  (Id.)

1    Plaintiff wrote that because of his back pain, he could not

2    lift "heavy objects" and could walk for only five to seven

3    minutes before needing to rest for five minutes.  (AR 180.)  He

4    could not follow written instructions but could pay attention for

5    one or two hours and had "no trouble" following spoken

6    instructions.  (Id.)  He had no problems with authority figures

7    or handling changes in his routine.  (AR 181.)  Plaintiff

8    reported that he did not "get stressed out," was "a very calm

9    person," and did not have any unusual behavior or fears.  (Id.)

10   In June 2011, Plaintiff reported to Dr. Jahan that he could

11   eat, dress, and bathe independently and could "do some household

12   chores, errands, shopping and cooking with his wife's help."  (AR

13   285.)  He managed his own money and took the bus for

14   transportation.  (Id.)

15   At the November 27, 2012 hearing, Plaintiff testified that

16   he could not work because his back was "very weak" and he

17   couldn't lift more than five pounds.  (AR 50.)  He testified that

18   he was "very nervous," cried, and got "angry" and "mad."  (AR

19   51.)  Plaintiff "forg[o]t stuff" and had a "memory problem"; his

20   wife would "write[] down stuff" for him to buy at the store.  (AR

21   54-55.)  He said that his "body gets weak" and "spasms."  (AR

22   55.)  Every day, he took medication and would "lay down to relax"

23   for three or four hours.  (Id.)

24   When the ALJ asked Plaintiff about the CDI investigators'

25   observations of him walking and "jogging across the street,"

26   Plaintiff testified that he went to the store for food because he

27   "ha[d] to eat," the store was "very close to the house," and he

28   "ha[d] pains when [he] walk[ed]" and had to stop and rest.  (AR

35

52.)

### 3.   <u>Analysis</u>

The ALJ found that Plaintiff "established a foundation for his basic symptoms" but that "the cumulative medical and lay evidence shows that he can engage in sustained work activity at the level assessed" in his RFC.  (AR 26; <u>see also</u> AR 29 (finding Plaintiff "not credible").)  The ALJ provided several clear and convincing reasons for finding Plaintiff not credible.

The ALJ permissibly found that Plaintiff's "conflicting, contradicting statements" "adversely affect[ed] his credibility." (AR 26; <u>see also</u> AR 29 (discussing inconsistencies).)  For example, in the February 2011 function report, Plaintiff wrote that he did not make his own meals, his only household chore was to take out the trash every other day (AR 177), he did "not leave the house unless [he] need[ed] to go to the store" (AR 179), and he couldn't take "long walks" (AR 180).  But just one month earlier, in January 2011, Plaintiff had told CDI investigators that he was able to prepare meals and perform household chores, "including cleaning," without assistance and that he "walk[ed] approximately six city blocks with his wife, two times a week to attend church."  (AR 242-43.)  Similarly, in February 2011, Plaintiff wrote that he was "a very calm person" and did "not get stressed out" (AR 181), but in November 2012, he testified that he was "very nervous," got "angry" and "mad," cried, and couldn't "control it" (AR 51, 54).  Plaintiff did not list any memory problems in the February 2011 function report (<u>see</u> AR 180 (leaving blank boxes for indicating problems with "memory," "completing tasks," "concentration," "understanding," and

36

"following instructions"), 177 (stating he didn't need reminders
to complete chores, take medicine, or take care of personal
needs)), but at the hearing he testified that he couldn't work in
part because of a "memory problem" (AR 54-55).  Nothing else in
the record indicates that Plaintiff's symptoms or impairments
worsened between February 2011 and November 2012.  Plaintiff's
contradictory accounts of his symptoms were a clear and
convincing reason for discounting his credibility.  See Thomas,
278 F.3d at 958-59.

     The ALJ found that Plaintiff's "credibility was gravely
damaged by his own behavior and statements during an inquiry by
the [CDI unit]."  (AR 28.)  Indeed, in his function report,
Plaintiff claimed to be totally disabled because of back pain (AR
175), stating that he couldn't walk for more than five to seven
minutes before he had to rest for five minutes (AR 180).  But CDI
investigators observed that he had a normal gait and could stand
and walk without difficulty.  (AR 243.)  Moreover, during one
visit, they observed him twice climb and descend two flights of
stairs without using handrails or showing any signs of pain, and
during another visit, they observed him walking at a moderate
pace, jogging across the street, and rapidly walking up two
flights of stairs, all with no sign of physical distress.  (Id.)
Although Plaintiff claimed to suffer from debilitating
psychological problems, the investigators observed that he was
alert, oriented, focused, and able to understand and answer
questions and recall information.  (Id.)  The ALJ did not err in
relying on the CDI report to discount Plaintiff's credibility.
See Elmore, 617 F. App'x at 757 (ALJ may rely on evidence related

to CDI investigations); <u>Darmaryan</u>, 2016 WL 1698252, at *8 ("The courts have recognized that an ALJ may consider the findings of a fraud investigation performed by the CDI when assessing a claimant's credibility.").

The ALJ also found that the "record is replete with a myriad of complaints supported by little objective evidence." (AR 26.) Plaintiff claimed to be disabled by his back condition, but as the ALJ noted (AR 26-27), Dr. Enriquez examined Plaintiff and found only that he had tenderness in the spine area and some decreased range of motion. (AR 246-47.) All of her other findings were normal — for example, Plaintiff had a normal gait, intact sensation, 5/5 strength, and normal ranges of motion of all other joints. (<u>Id.</u>) And lumbar-spine x-rays showed only mild degenerative disease at one level. (AR 248.) Plaintiff also claimed to suffer from debilitating psychological impairments, but as the ALJ found (AR 27-28), Dr. Jahan's clinical findings were mostly normal: Plaintiff was calm, directable, focused, cooperative, and oriented, and he had spontaneous and fluent speech; intact attention, recall, and memories; logical and sequential thoughts; an average general fund of knowledge; and fair insight and judgment (AR 283, 286-87). The ALJ was entitled to consider the lack of objective medical evidence in assessing Plaintiff's subjective complaints and his credibility. <u>See</u> <u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); <u>Carmickle</u>, 533 F.3d at 1161 ("Contradiction with the medical

1  record is a sufficient basis for rejecting the claimant's

2  subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in

3  determining credibility, ALJ may consider "whether the alleged

4  symptoms are consistent with the medical evidence").

5      The ALJ also noted that although Plaintiff received Paxil

6  from his primary-care physician (AR 27), he "never sought mental

7  health treatment in all the 23 years he had allegedly been

8  suffering from major mental issues" but then "conveniently sought

9  mental health treatment for the first time a month after the

10  January 2012 reconsideration denying his request for continuing

11  disability benefits." (AR 28; see AR 285 (Dr. Jahan noting in

12  June 2011 that Plaintiff denied having ever seen psychiatrist or

13  receiving psychotherapy and did not see therapist).) Indeed, the

14  record shows that before February 2012, Plaintiff's only

15  treatment for his allegedly debilitating psychiatric problems was

16  an antidepressant prescribed by his primary-care physician.

17  (See, e.g., AR 258, 260, 262-66 (Dr. Karapetian's notations that

18  Plaintiff's medications included Zoloft or Paxil).)[21] But almost

19  immediately after the DRO issued his January 12, 2012 decision

20  finding him no longer disabled (AR 80-89), Plaintiff sought

21  treatment from a psychiatrist, who prescribed three additional

22  psychiatric medications (AR 345 (Dr. Gevorkian noting that

23  Plaintiff's current medications included Seroquel XR, Cymbalta,

24

25

26      [21] Zoloft is a selective serotonin reuptake inhibitor used
27  to treat depression and other conditions. Sertraline,
    MedlinePlus, https://www.nlm.nih.gov/medlineplus/druginfo/
28  meds/a697048.html (last updated Nov. 15, 2014).

and Atarax).)[22]  The ALJ did not err in discounting Plaintiff's

credibility based on his unexplained failure to seek specialized

mental-health treatment for 23 years.  See Tommasetti v. Astrue,

533 F.3d 1035, 1039 (9th Cir. 2008) (ALJ may discount claimant's

testimony in light of "unexplained or inadequately explained

failure to seek treatment or to follow a prescribed course of

treatment"); SSR 96-7p, 1996 WL 374186, at *7 (claimant's

statements "may be less credible if the level or frequency of

treatment is inconsistent with the level of complaints"); Molina,

674 F.3d at 1114 (ALJ permissibly discounted plaintiff's

credibility in part because she was advised to seek counseling

but "failed to do so until after she applied for disability

benefits").[23]

    Plaintiff claims that the ALJ "erroneously concluded" that

he "was not disabled because he could do minor household chores

---

[22] Seroquel XR is an antipsychotic used to treat
schizophrenia.  Quetiapine, MedlinePlus, https://www.nlm.nih.gov/
medlineplus/druginfo/meds/a698019.html (last updated Apr. 15,
2014).  Cymbalta is a selective serotonin and norepinephrine
reuptake inhibitor used to treat depression and generalized
anxiety disorder.  Duloxetine, MedlinePlus, https://
www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html (last
updated Nov. 15, 2014).  Atarax is an antihistamine used to treat
conditions including anxiety.  Hydroxyzine, MedlinePlus, https://
wwwqa.nlm.nih.gov/medlineplus/qa1/druginfo/meds/a682866.html
(last updated Sept. 1, 2010).

[23] The Ninth Circuit has held that "it is a questionable
practice to chastise one with a mental impairment for the
exercise of poor judgment in seeking rehabilitation," Nguyen v.
Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (citation omitted);
Regennitter v. Comm'r of Soc. Sec. Admin., 166 F.3d 1294, 1299-
300 (9th Cir. 1999), but here nothing indicates that Plaintiff's
failure to seek treatment from a psychiatrist or therapist "was
attributable to [his] mental impairment rather than [his] own
personal preference," Molina, 674 F.3d at 1114.

40

such as cooking, cleaning, and grocery shopping." (J. Stip. at
21.) But as discussed above, the ALJ validly discounted
Plaintiff's credibility because his descriptions of his daily
activities were inconsistent with each other, among other clear
and convincing reasons. Plaintiff also argues that his
"difficulties" in "understanding the questions presented to him
at the hearing" support his account of his psychiatric symptoms.
(J. Stip. at 33, 35.) But the ALJ, who observed Plaintiff during
the hearing, found that Plaintiff simply "feigned confusion" and
gave "vague and unresponsive answers." (AR 29.) Those findings
also supported her credibility determination. See Tonapetyan,
242 F.3d at 1148 (noting that ALJ may rely on his observations of
plaintiff at hearing as part of overall credibility
determination). In any event, a review of the hearing transcript
shows that Plaintiff gave rational answers to almost all the
questions and tended to hesitate primarily when the ALJ posed
difficult questions about the CDI investigators' observations of
him walking, jogging, and climbing stairs without difficulty.
(See AR 50-56.)

     Because substantial evidence in the record supports the
ALJ's credibility determination, the reviewing court "may not
engage in second-guessing." Thomas, 278 F.3d at 959. Remand is
not warranted on this ground.

     D.   Any Error in the ALJ's Reliance on the VE's Testimony
          Was Harmless

     Plaintiff contends that the VE's testimony did "not provide
substantial evidence that [he] has the [RFC] to perform other
jobs in the national economy" because the VE "was not

41

specifically asked" how many of the identified jobs "would be available for a person such as Plaintiff with a limited fluency in English, a limited educational background, and physical and mental impairments which make it difficult for [him] to follow instructions and cope with workplace stress." (J. Stip. at 37.) Plaintiff further argues that this case is analogous to <u>Pinto v. Massanari</u>, 249 F.3d 840 (9th Cir. 2001), because neither the ALJ nor the VE addressed the impact of Plaintiff's alleged illiteracy on his ability to perform the identified jobs. (J. Stip. at 41.) For the reasons discussed below, remand is not warranted on this ground.

　　　　　　　　1.　<u>Relevant background</u>

　　　Plaintiff testified with the assistance of an interpreter at the November 2012 hearing. (AR 44.) During the hearing, the ALJ questioned Plaintiff as follows:

　　Q　. . . [H]ow far did you get in school?

　　A　8th grade.[24]

　　Q　Was that in the states, or in Armenia?

　　A　Armenia.

　　Q　And do you understand some English?

　　A　Yes.

　　Q　Okay, but a little bit.

　　A　Yeah.

(AR 56.)

　　　The ALJ later presented the VE with a hypothetical "younger

---

　　　[24] As previously noted, some evidence in the record shows that Plaintiff completed the 12th grade. (<u>See</u> AR 234.)

individual, with an 8th grade education, but no past relevant work" who was capable of medium work with only frequent bending, twisting, and stooping and who was "illiterate in English." (AR 57.)  The VE testified that such an individual could work as a hand packager, DOT 920.587-018, 1991 WL 687916; cleaner II, DOT 919.687-014,[25] 1991 WL 687897; or industrial cleaner, DOT 381.687-018, 1991 WL 673258.  (AR 57-58.)  The DOT provides that the hand-packager and cleaner II positions require Level 1 language skills and the industrial-cleaner position requires Level 2 language skills.  See DOT 920.587-018, 1991 WL 687916; DOT 919.687-014, 1991 WL 687897; DOT 381.687-018, 1991 WL 673258. After responding to three additional hypotheticals, the VE stated that his testimony was consistent with the DOT.  (AR 59.)

In her November 2012 decision, the ALJ formulated an RFC for a limited range of medium work without including any limitations based on illiteracy.  (AR 26.)  Later in the opinion, she determined that Plaintiff had a "limited education" and was "able to communicate in English," citing 20 C.F.R. § 416.964.  (AR 30.) She summarized the VE's testimony, found that it was "consistent with the information contained in the [DOT]," and relied on it to find that Plaintiff could perform work in the national economy. (AR 31.)  She therefore determined that Plaintiff was no longer disabled.  (AR 31-32.)

---

[25] Both the VE and the ALJ cited DOT 919.687-010 in reference to the cleaner II job (AR 31, 57), but the correct code is DOT 919.687-014.

43

1

###### 2. Applicable law

2    The DOT is the best source of information about how a job is

3  generally performed.  See Carmickle, 533 F.3d at 1166; see also

4  Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995);

5  § 416.966(d)(1).  In order to rely on a VE's testimony regarding

6  the requirements of a particular job, an ALJ must inquire whether

7  the testimony conflicts with the DOT.  Massachi v. Astrue, 486

8  F.3d 1149, 1152-53 (9th Cir. 2007) (citing SSR 00-4p, 2000 WL

9  1898704, at *4 (Dec. 4, 2000)).  When such a conflict exists, the

10  ALJ may accept VE testimony that contradicts the DOT only if the

11  record contains "persuasive evidence to support the deviation."

12  Pinto, 249 F.3d at 846 (citing Johnson, 60 F.3d at 1435); see

13  also Tommasetti, 533 F.3d at 1042 (finding error when "ALJ did

14  not identify what aspect of the VE's experience warranted

15  deviation from the DOT").

16    According to the DOT, a person with Level 1 language

17  proficiency can "[r]ecognize [the] meaning of 2,500 (two- or

18  three-syllable) words"; read "95-120 words per minute";

19  "[c]ompare similarities and differences between words and between

20  series of numbers"; "[p]rint simple sentences containing subject,

21  verb, and object, and series of numbers, names, and addresses";

22  and "[s]peak simple sentences, using normal word order, and

23  present and past tenses."  See DOT, App. C, 1991 WL 688702.  A

24  person with Level 2 language proficiency has a "[p]assive

25  vocabulary of 5,000-6,000 words" and can read "190-215 words per

26  minute"; "[r]ead adventure stories and comic books, looking up

27  unfamiliar words in dictionary for meaning, spelling, and

28  pronunciation"; "[r]ead instructions for assembling model cars

and airplanes"; "[w]rite compound and complex sentences, using
cursive style, proper end punctuation, and employing adjectives
and adverbs"; and "[s]peak clearly and distinctly with
appropriate pauses and emphasis, correct punctuation, variations
in word order, using present, perfect, and future tenses." Id.

### 3. Analysis

As an initial matter, to the extent Plaintiff contends that
the ALJ erred by failing to include in her hypothetical to the VE
limitations on following instructions and dealing with workplace
stress (see J. Stip. at 37), that argument fails. As discussed
above, the ALJ properly weighed the medical evidence and
Plaintiff's credibility in determining that he retained the RFC
for medium work with only frequent bending, stooping, and
twisting. The ALJ was not required to include in the RFC or the
VE hypothetical limitations that were permissibly discounted.
See Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005)
("Preparing a function-by-function analysis for medical
conditions or impairments that the ALJ found neither credible nor
supported by the record is unnecessary."); Batson, 359 F.3d at
1197 (ALJ not required to incorporate into RFC those findings
from treating-physician opinions that were "permissibly
discounted"); see also Yelovich v. Colvin, 532 F. App'x 700, 702
(9th Cir. 2013) ("Because the RFC was not defective, the
hypothetical question posed to the VE was proper.").

To the extent Plaintiff challenges the ALJ's reliance on the
VE's testimony that an illiterate person could perform jobs
requiring levels 1 and 2 language skills, remand is not
warranted. As an initial matter, a claimant is not per se

45

disabled simply because he is illiterate.  <u>See</u> <u>Pinto</u>, 249 F.3d at
847.  Indeed, Level 1 is the lowest language level used in the
DOT; thus, "[a] decision holding that illiterate individuals
could not perform Level 1 jobs would mean that illiteracy was a
per se disability under the DOT."  <u>Meza v. Astrue</u>, No.
C-09-1402-EDL, 2011 WL 11499, at *21 (N.D. Cal. Jan. 4, 2011)
(citing <u>Lawson v. Apfel</u>, 46 F. Supp. 2d 941, 945, 947 (W.D. Mo.
1998) (noting that "such a holding is illogical and would
directly contradict the Social Security regulations")); <u>see also</u>
SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000) ("The DOT lists
maximum requirements of occupations as generally performed, not
the range of requirements of a particular job as it is performed
in specific settings.").

     Nevertheless, the VE's testimony that an illiterate
individual could perform the jobs of hand packager, cleaner II,
and industrial cleaner arguably conflicted with the DOT because
those jobs involve Level 1 and Level 2 language skills, which
require at least the ability to recognize the meaning of 2500
words, read 95 words a minute, and write very simple sentences.
(AR 57-58); <u>see</u> DOT 920.587-018, 1991 WL 687916; DOT 919.687-014,
1991 WL 687865; DOT 381.687-018, 1991 WL 673258; <u>Pinto</u>, 249 F.3d
at 846-47 (finding conflict between DOT and VE testimony that
illiterate claimant could perform jobs with Level 1 language
skills); <u>but see Meza</u>, 2011 WL 11499, at *21 (finding no conflict
between DOT and VE testimony that illiterate non-English-speaking
person could perform jobs requiring Level 1 language skills).
The ALJ, moreover, failed to explain or elicit VE testimony
explaining how an illiterate person could perform jobs with such

requirements.

But any error in failing to resolve that apparent conflict was harmless because the ALJ in fact never found that Plaintiff was illiterate.  To the contrary, she concluded that he had a "limited education" and was "able to communicate in English," citing § 416.964.  (AR 30.)  That regulation defines "illiteracy" as "the inability to read or write" and states that "[g]enerally, an illiterate person has had little or no formal schooling." § 416.964(b)(1).  It defines "marginal education" as "ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs," § 416.964(b)(3), and "limited education" as "ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs," § 416.964(b)(3).[26]  The ALJ's explicit finding that Plaintiff had a "limited education" shows that she did not believe him to be illiterate.  (AR 30.)  Section 416.964 also states that the "[i]nability to communicate in English" may be considered an "educational factor" because "it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the

---

[26] Section 416.964 defines one other category of educational background, "high school education and above," which

means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above.  We generally consider that someone with these educational abilities can do semi-skilled through skilled work.

§ 416.964(b)(4).

47

1   person may have in another language." § 416.964(b)(5).  The ALJ,

2   however, specifically found that Plaintiff was able to

3   communicate in English.  (AR 30.)

4       The ALJ also pointed to evidence that supported her finding

5   regarding Plaintiff's language skills.  She noted that "[a]n

6   Armenian interpreter was present at the hearing" but that

7   Plaintiff "frequently answered questions before the interpreter

8   completed the translation of the undersigned's questions, and

9   would say 'yes' to confirm the interpreter's statements."  (AR

10  29.)  She also noted that Plaintiff "spoke in English several

11  times during the hearing."  (Id.)  Indeed, Plaintiff admitted at

12  the hearing that he was able to understand "some English."  (AR

13  56.)  The ALJ also noted that nothing showed that "the CDI

14  investigative interview was conducted with the aid of an Armenian

15  interpreter."  (AR 29.)  And it appears that at least one

16  psychiatric interview might have been conducted without the

17  assistance of an interpreter.  (See AR 283 (Dr. Jahan's

18  psychiatric report not indicating that Plaintiff was assisted by

19  interpreter and stating that Plaintiff was "[t]he source of

20  information for the evaluation").)

21      Although Plaintiff claims to be unable to read English or

22  write anything other than his name in English (AR 163), the ALJ

23  found that he generally was not credible; moreover, Plaintiff

24  apparently was able to complete lengthy written disability and

25  function reports on his own and in English (see AR 163-74

26  (disability report completed in English and stating that person

27  completing report was "[t]he person who is applying for

28  disability"); 175-82 (function report completed in English and in

48

first person and listing Plaintiff as "person completing this form")).  Thus, although some evidence shows that Plaintiff had difficulty communicating in English (see, e.g., AR 68 (DRO's checking of "no" under "ability to read/write/speak/understand English" and noting "Interpreter"), 205 (field office worker's notation that Plaintiff spoke "limited English"), 244 (Dr. Enriquez's notation that Plaintiff was assisted by interpreter)), the evidence reasonably supports the ALJ's finding regarding Plaintiff's language skills, and the Court therefore must uphold it.  See Reddick, 157 F.3d at 720-21 ("If the evidence can reasonably support either affirming or reversing," reviewing court "may not substitute its judgment" for Commissioner's).

The descriptions of the three identified jobs further support the ALJ's conclusion that Plaintiff could perform them. A person performing the hand-packager job

> [p]ackages materials and products manually, performing any combination of following duties:  Cleans packaging containers.  Lines and pads crates and assembles cartons.  Obtains and sorts product.  Wraps protective material around product.  Starts, stops, and regulates speed of conveyor.  Inserts or pours product into containers or fills containers from spout or chute.  Weighs containers and adjusts quantity.  Nails, glues, or closes and seals containers.  Labels containers, container tags, or products.  Sorts bundles or filled containers.  Packs special arrangements or selections of product.  Inspects materials, products, and containers at each step of packaging process.  Records information, such as weight,

49

1    time, and date packaged.

2    920.587-018, 1991 WL 687916.   A person performing the cleaner II

3    job

4        [c]leans  interiors  and  exteriors  of  transportation

5        vehicles, such as airplanes, automobiles, buses, railroad

6        cars, and streetcars:  Cleans interior of vehicle, using

7        broom,  cloth,  mop,  vacuum  cleaner,  and  whisk  broom.

8        Cleans windows with water, cleansing compounds, and cloth

9        or  chamois.   Replenishes  sanitary  supplies  in  vehicle

10       compartments.   Removes  dust,  grease,  and  oil  from

11       exterior  surfaces  of  vehicles,  using  steam-cleaning

12       equipment,  or  by  spraying  or  washing  vehicles,  using

13       spraying equipment, brush or sponge.

14   919.687-014, 1991 WL 687897.   And someone performing the

15   industrial-cleaner job

16       [k]eeps  working  areas  in  production  departments  of

17       industrial establishment in clean and orderly condition,

18       performing  any  combination  of  following  duties:

19       Transports  raw  materials  and  semifinished  products  or

20       supplies  between  departments  or  buildings  to  supply

21       machine  tenders  or  operators  with  materials  for

22       processing, using handtruck.  Arranges boxes, material,

23       and handtrucks or other industrial equipment in neat and

24       orderly manner.  Cleans lint, dust, oil, and grease from

25       machines, overhead pipes, and conveyors, using brushes,

26       airhoses, or steam cleaner.  Cleans screens and filters.

27       Scrubs processing tanks and vats.  Cleans floors, using

28       water hose, and applies floor drier.  Picks up reusable

50

1    scrap for salvage and stores in containers.

2    381.687-018, 1991 WL 673258.  Thus, it appears that the three

3    jobs require little to no reading and writing.

4        Plaintiff's reliance on Pinto is misplaced.  There, the ALJ

5    specifically found that the plaintiff was "illiterate in

6    English," Pinto, 249 F.3d at 843 n.1, and the ALJ's hypothetical

7    to the VE was accordingly based on an individual who was "neither

8    litera[te] in [E]nglish nor able to communicate in [E]nglish."

9    Id. at 843 (alterations in original).  The Ninth Circuit,

10   moreover, found that there was "no indication that [Plaintiff

11   knew] 2,500 words in English, the requirement to reach language

12   level '1' in the [DOT] classifications."  Pinto, 249 F.3d at 843

13   n.1.  Here, by contrast, the ALJ did not find that Plaintiff was

14   illiterate; rather, she found that he had a "limited education"

15   and was able to communicate in English (AR 30), and those

16   findings were supported by substantial evidence.  As such, Pinto

17   does not apply.

18       Because the ALJ never found that Plaintiff was illiterate,

19   her failure to resolve the conflict in the VE's testimony that an

20   illiterate person could perform the identified jobs was

21   harmless.[27]  See Stout, 454 F.3d at 1055 (nonprejudicial or

22

23       [27] Even if the ALJ erred in concluding that Plaintiff could
     perform the industrial-cleaner job, which requires Level 2
24   language skills, it was harmless because the other two jobs
     required only Level 1 skills and existed in sufficient numbers in
25   the economy.  (See AR 57-58 (VE testifying that 338,000 national
     and 6000 regional hand-packager jobs existed and 144,000 national
26   and 2600 regional cleaner II jobs existed)); Gutierrez v. Comm'r
     of Soc. Sec., 740 F.3d 519, 529 (9th Cir. 2014) (finding 25,000
27   national jobs significant); Yelovich, 532 F. App'x at 702
28                                                    (continued...)

irrelevant mistakes harmless); <u>see also</u> <u>Rivera v. Colvin</u>, No. CV 14-09217-KS, 2016 WL 94231, at *6-8 (C.D. Cal. Jan. 7, 2016) (finding no conflict between DOT and VE's testimony that person with "somewhat limited ability to communicate in English" could perform jobs requiring Level 1 language proficiency). Remand is not warranted on this ground.

**VI.  CONCLUSION**

Consistent with the foregoing, and under sentence four of 42 U.S.C. § 405(g),[28] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice. IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: May 23, 2016

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[27] (...continued) (finding 900 regional jobs significant); <u>Thomas</u>, 278 F.3d at 960 (finding 1300 jobs in state significant); <u>Meanel v. Apfel</u>, 172 F.3d 1111, 1115 (9th Cir. 1999) (finding between 1000 and 1500 jobs in local area significant).

[28] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."